879 F.2d 541
 UNITED STATES of America, Plaintiff-Appellee,
v.
Epifanio SANCHEZ-LOPEZ; Brijido Astorga-Ayon,
Defendants-Appellants.
UNITED STATES of America, Plaintiff-Appellee,
v.
Antonio MARTINEZ-ORTEGA, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Guillermo SANCHEZ-LOPEZ, Defendant-Appellant.
 Nos. 88-3102, 88-3104 and 88-3105.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 5, 1989.
Decided June 22, 1989.
 
 Philip Gordon, Sallaz and Doolittle, Boise, Idaho, for defendants/appellants Epifanio Sanchez-Lopez and Brijido Astorga-Ayon.
 Rudolf D. Barchas, Boise, Idaho, for defendant/appellant Antonio Martinez-Ortega.
 M. Karl Shurtliff, Boise, Idaho, for defendant/appellant, Guillermo Sanchez-Lopez.
 Monte J. Stiles, Asst. U.S. Atty., Boise, Idaho, for plaintiff-appellee.
 Appeal from the United States District Court for the District of Idaho (Boise).
 Before ALARCON and THOMPSON, Circuit Judges, and TASHIMA,* District Judge.
 ALARCON, Circuit Judge:
 
 
 1
 Epifanio Sanchez-Lopez, Brijido Astorga-Ayon, Antonio Martinez-Ortega, and Guillermo Sanchez-Lopez (appellants) appeal from the district court's judgment of conviction for conspiracy to distribute cocaine under 21 U.S.C. Secs. 841(a)(1) and (b)(1)(B), 846; conspiracy to distribute heroin under 21 U.S.C. Secs. 841(a)(1) and (b)(1)(B), 846; possession of cocaine with intent to distribute under 21 U.S.C. Sec. 841(a)(1) and (b)(1)(B); possession of heroin with intent to distribute under 21 U.S.C. Sec. 841(a)(1) and (b)(1)(B); and use of a communication facility to facilitate the commission of drug felonies under 21 U.S.C. Sec. 843(b). 684 F.Supp. 634. Appellants seek reversal on the following grounds:
 
 
 2
 (1) The district court erred when it refused to dismiss the indictment because Hispanics are under-represented on the grand and petit juries in the District Court for the District of Idaho in violation of the fifth and sixth amendments and the Jury Selection and Service Act.
 
 
 3
 (2) The district court erred in denying appellants' motions for election of counts.
 
 
 4
 (3) The district court erred in denying appellants' motions for severance of counts.
 
 
 5
 (4) The district court's comments and demeanor before the jury demonstrated a "partiality" for the prosecution resulting in prejudicial error.
 
 
 6
 (5) The district court erroneously admitted hearsay testimony linking appellants Astorga-Ayon and Martinez-Ortega.
 
 
 7
 (6) The cumulative impact of the district court's incorrect evidentiary rulings established "harmful error."
 
 
 8
 (7) The district court erred in refusing to give sentencing point reductions based on its conclusion that the participation of three of the appellants in the criminal activity was not minimal.
 
 
 9
 (8) The district court erred when it applied the career offender sentencing guideline provisions to appellant Martinez-Ortega.
 
 
 10
 We affirm in part and remand with directions.
 
 
 11
 * FACTS
 
 
 12
 In July 1987, investigators with the Federal Organized Crime/Drug Enforcement Task Force for the District of Idaho began an undercover investigation into the cocaine and heroin trafficking activities of appellant Antonio Martinez-Ortega and his associates as a result of information received from an informant. As part of the undercover operation, the confidential informant and an undercover D.E.A. agent posed as potential heroin and cocaine customers for Martinez-Ortega. Pursuant to their negotiations with Martinez-Ortega, the informant and D.E.A. agents made a controlled purchase of black tar heroin from Martinez-Ortega and his associates in Delano, California, on August 26, 1987.
 
 
 13
 Subsequently, Martinez-Ortega sold the informant and D.E.A. agents another ounce of black tar heroin. During these two purchases, Martinez-Ortega offered to sell the government agents much larger quantities of cocaine in the future. Pursuant to this offer, Martinez-Ortega and the other three appellants after a number of telephone calls arranged to bring cocaine and heroin to Idaho.
 
 
 14
 On November 22, 1987, Martinez-Ortega advised the confidential informant that appellants were en route to Idaho in two vehicles. Appellants were stopped in Idaho by agents of the Idaho Bureau of Narcotics, the Idaho State Police, the Drug Enforcement Administration, and the United States Immigration and Naturalization Service. Martinez-Ortega was in the lead vehicle driven by Epifanio Sanchez-Lopez. Guillermo Sanchez-Lopez drove the trailing vehicle. Astorga-Ayon was a passenger in the second car. The car driven by Epifanio Sanchez-Lopez contained approximately 2 1/2 kilograms of cocaine and 100 grams of black tar heroin wrapped in three packages. The fingerprints of Epifanio Sanchez-Lopez, Guillermo Sanchez-Lopez, and Astorga-Ayon were found on the packages.
 
 
 15
 Appellants were charged in an eleven-count indictment with conspiracy to distribute heroin and cocaine, possession with intent to distribute heroin and cocaine, illegal transportation of aliens, alien in possession of a firearm, and use of a communication facility to facilitate the commission of drug felonies. After a jury trial, appellants were convicted on all counts, except for the two counts alleging transportation of illegal aliens.
 
 
 16
 Following the verdicts, appellants filed motions attacking the validity of the Sentencing Guidelines. On May 6, 1988, the district court found that the Sentencing Guidelines were unconstitutional. The effect of the ruling was stayed pending a decision by the Supreme Court on this question. Subsequently, the appellants were sentenced in separate and alternative judgments pursuant to the Sentencing Guidelines and according to the law prior to the effective date of the Sentencing Guidelines. Except for Martinez-Ortega, the appellants received identical sentences in the alternative orders. Martinez-Ortega received a 30-year sentence under the Sentencing Guidelines. In the alternative sentence imposed without following the Sentencing Guidelines Martinez-Ortega was ordered to serve 20 years. Appellants filed timely notices of appeal.
 
 II
 DISCUSSION
 
 17
 A. Fifth and Sixth Amendment Jury Selection Challenge
 
 
 18
 Prior to trial appellants moved for a dismissal of the indictment. They contended that the manner in which the grand and petit jury panels are chosen in the federal district courts in Idaho deprived appellants of their right to a fair and impartial jury, under the fifth and sixth amendments and the Jury Selection and Service Act, 28 U.S.C. Secs. 1861-1863, because Hispanics are under-represented on the grand and petit juries. The district court denied the motion. The court concluded that appellants had failed to establish a prima facie case of a constitutional and statutory violation.
 
 
 19
 We review independently and non-deferentially a challenge to the composition of grand and petit juries. United States v. Miller, 771 F.2d 1219, 1227 (9th Cir.1985). "The test for a constitutionally selected jury is the same whether challenged under the Sixth Amendment of the Constitution or under the Jury Selection and Service Act." Id. The Supreme Court has developed a three part test to determine whether a jury selection process passes a sixth amendment challenge. Duren v. Missouri, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979). A prima facie violation of the fair cross-section requirement is established upon a showing:
 
 
 20
 (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.
 
 
 21
 Id.
 
 
 22
 The first prong of the Duren test has been met. Hispanics are members of a distinctive and identifiable group in the community. Castaneda v. Partida, 430 U.S. 482, 495, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977).
 
 
 23
 Under the second prong of the Duren test, appellants were required to show that the representation of Hispanics in venires from which juries are selected is not fair and reasonable in relation to the number of Hispanics in the community. Duren, 439 U.S. at 364, 99 S.Ct. at 668. Appellants presented statistical evidence in the district court indicating that Hispanics comprised 3.87% of the total population of Idaho and 5.59% of the population in the Southern Division of Idaho. Appellants looked at the surnames of individuals on the master jury wheel and determined that 65 or 1.82% of the names were Hispanic and that 47 or 2.79% of the names on the Southern Division wheel were Hispanic.
 
 
 24
 The government challenges the accuracy of appellants' statistics on two grounds. The government contends that some of the total population figures used were 1988 projections based on the 1980 census. Furthermore, appellants presented no evidence indicating what portion of the Hispanics in the total population were "non-citizens, juveniles or otherwise ineligible for jury service."
 
 
 25
 The district court's order rests on the implicit conclusion that the defendants were required to provide jury eligible population figures. In Castaneda, however, the Court allowed the defendant to demonstrate a prima facie case of an equal protection violation using total population figures. 430 U.S. at 495-96, 97 S.Ct. at 1280-81. In Duren, which dealt with a sixth amendment challenge, the Supreme Court's language suggests that the government has the right to present evidence to challenge a defendant's statistics. See Duren, 439 U.S. at 365, 99 S.Ct. at 669. (State of Missouri never challenged the data and court's speculation that population patterns had changed during the relevant time period was not supported by any evidence in the record.)
 
 
 26
 Because the government, while arguing that the district court expressed grave concerns about the accuracy of appellants' proof, failed to present any evidence that contradicted appellants' figures, we will assume for purposes of this analysis that the statistics are valid.
 
 
 27
 In determining the underrepresentation of a particular group in jury venires, we have consistently favored an absolute disparity analysis and have rejected a comparative disparity analysis. United States v. Suttiswad, 696 F.2d 645, 648-49 (9th Cir.1982); United States v. Armstrong, 621 F.2d 951, 955-56 (9th Cir.1980); United States v. Kleifgen, 557 F.2d 1293, 1296-97 (9th Cir.1977); United States v. Potter, 552 F.2d 901, 905-06 (9th Cir.1977).
 
 
 28
 We determine absolute disparity by taking the percentage of the group at issue in the total population and subtracting from it the percentage of that group that is represented on the master jury wheel. Under an absolute disparity analysis, Hispanics are underrepresented on the master jury wheel by 2.05% (i.e., 3.87% Hispanics in total population minus 1.82% Hispanics on master jury wheel) and on the Southern Division wheel by 2.8% (i.e., 5.59% Hispanics in Southern Division minus 2.79% Hispanics on Southern Division wheel). Under absolute disparity analysis we can determine the impact of the underrepresentation in terms of the numerical composition of the grand jury. Thus, in an array of 100 jurors, using the figures calculated, Hispanics would be underrepresented by approximately 2 or 3 jurors.
 
 
 29
 Comparative disparity is determined by taking the absolute disparity percentage and dividing that number by the percentage of the group in the total population. Under a comparative disparity analysis, Hispanics are underrepresented on the master jury wheel by 52.9% (i.e., absolute disparity of 2.05% divided by total number of Hispanics in the population of 3.87%) and they are underrepresented in the Southern Division by 50.0% (i.e., absolute disparity of 2.8% divided by number of Hispanics in the population of the Southern Division of 5.59%). A comparative analysis is disfavored because it exaggerates the effect of any deviation. Kleifgen, 557 F.2d at 1297.
 
 
 30
 Appellants concede that under an absolute disparity analysis they have not demonstrated substantial underrepresentation. See Suttiswad, 696 F.2d at 649 (absolute disparity of 2.8% for Blacks, 7.7% for Spanish, and 4.7% for Asians was not substantial); Armstrong, 621 F.2d at 955-56 (absolute disparity of 2.83% for Blacks was not substantial); Kleifgen, 557 F.2d at 1297 (absolute disparity of 2.9% for Blacks and 4.4% for males was not substantial); Potter, 552 F.2d at 906 (absolute disparity of 2.7% for Blacks was not substantial).
 
 
 31
 Appellants urge this court to conduct "a thorough reexamination of its decisional precedent" in light of the Supreme Court's decision in Vasquez v. Hillery, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986), because an absolute disparity of 4.7% existed in that case and the Court concluded that the defendant had demonstrated a constitutional violation.
 
 
 32
 Appellants' reliance on Vasquez in support of their sixth amendment and statutory challenge is misplaced. Vasquez involved an equal protection challenge to the composition of the grand jury which indicted the defendant. Id. at 255-56, 106 S.Ct. at 619-20. Intentional discrimination was established in Vasquez. Id. Appellants stated at oral argument that they were not claiming intentional discrimination.
 
 
 33
 Moreover, the Court in Vasquez did not discuss absolute disparity. Appellants have calculated the absolute disparity in Vasquez based on the census figure set forth in a footnote to the dissenting opinion. Id. at 268 n. 2, 106 S.Ct. at 626 n. 2 (Powell, J., dissenting). It should also be noted that the disparity in the instant matter is less than the 4.7% absolute disparity shown by the census statistics set forth in Justice Powell's dissent in Vasquez.
 
 
 34
 Appellants further contend that this circuit's reliance on absolute disparity analysis is not controlling where the existence of a strong prejudice against a particular minority group has been demonstrated. In support of this proposition, appellants rely on dictum in our decision in Potter in which we stated "[w]here the group in question shares many common attitudes and is considered to be distinct by others, a smaller deviation may destroy the presence of a fair cross-section than would be the case with a group which is less clearly defined." 552 F.2d at 906.
 
 
 35
 Appellants contend that a strong prejudice against Hispanics exists in Idaho. Appellants rely on an independent survey taken during appellants' trial which was designed to elicit information concerning the extent of ethnic, racial and religious intolerance within Idaho. The government contends the survey should not be considered because it is not a part of the record.
 
 
 36
 Pursuant to Federal Rule of Appellate Procedure 10(a), exhibits and papers not filed with the district court or admitted into evidence are not part of the appellate record. Accordingly, we decline to consider the survey in resolving the issues presented in this direct appeal. Appellants' survey is stricken from the record. See Kirshner v. Uniden Corp. of America, 842 F.2d 1074, 1077 (9th Cir.1988) (declarations submitted to the Ninth Circuit but never filed or submitted to the district court were not part of the record on appeal); Trans-Sterling, Inc. v. Bible, 804 F.2d 525, 528 (9th Cir.1986) (motion to enlarge the record on appeal with subsequent newspaper article was denied as inappropriate).
 
 
 37
 Because the second prong of the Duren test has not been met, we do not reach the final prong. Appellants failed to establish a prima facie violation under the Duren test. The district court did not err in refusing to dismiss the indictments.
 
 B. Election of Counts
 
 38
 Appellants contend that the district court erred in denying their motions for election of counts because Counts I and III of the indictment were multiplicious. "We review the denial of a motion to require an election of counts for abuse of discretion." United States v. Kennedy, 726 F.2d 546, 547 (9th Cir.), cert. denied, 469 U.S. 965, 105 S.Ct. 365, 83 L.Ed.2d 301 (1984).
 
 
 39
 Count I of the indictment charged appellants with conspiracy to distribute 500 grams of cocaine in violation of 21 U.S.C. Secs. 841(a)(1) and 846. Count III charged appellants with a conspiracy to distribute 100 grams of heroin in violation of 21 U.S.C. Secs. 841(a)(1) and 846. The overt acts alleged in Count I and Count III were identical. The overt acts, however, were removed from the superseding indictment. The district court denied appellants' motions for election of counts on the final day of trial without explanation.
 
 
 40
 In United States v. Peacock, 761 F.2d 1313, 1319 (9th Cir.), cert. denied, 474 U.S. 847, 106 S.Ct. 139, 88 L.Ed.2d 114 (1985), we found that Count I of an indictment charging a conspiracy to manufacture and distribute amphetamines and Count II charging a conspiracy to manufacture and distribute P-2-P were multiplicious. We stated that the crime of conspiracy contemplates an agreement to commit unlawful acts. "If there exists but a single agreement to achieve the objectives of the conspiracy, there exists but a single conspiracy." Id. After recognizing that each case depends on its own facts, we concluded that the evidence established a single conspiracy. Id. "The two counts charged violations of not only the same conspiracy statute, but also the same underlying statute, the same parties, duration, location, and overt acts." Id.; see also Launius v. United States, 575 F.2d 770, 771 (9th Cir.1978) (information charging a conspiracy to smuggle heroin and a conspiracy to smuggle amphetamines was multiplicious).
 
 
 41
 In the instant matter, Count I, alleging a conspiracy to distribute cocaine, and Count III, alleging a conspiracy to distribute heroin, were multiplicious. The counts were identical except for the drug involved. Counts I and III not only charged violations of the same conspiracy statute but also alleged the same statute regarding the underlying substantive offenses. Finally, the same parties, duration, location, and overt acts were alleged. The facts pleaded in the indictment show the existence of one conspiracy. Therefore, the district court erred in denying the motion for election of counts.
 
 
 42
 The government argues that it would have been improper to allege conspiracy to distribute cocaine and heroin in one count because the penalties are different depending upon the nature of the controlled substance. The government also asserts that alleging the conspiracy in one count would have confused the jury because some of the evidence could have caused the jury to convict the appellants of a conspiracy to distribute cocaine, but not heroin, or a conspiracy to distribute heroin, but not cocaine. However, as we have stated, "the government may allege a single conspiracy in several counts to meet the uncertainties of the evidence." United States v. Abascal, 564 F.2d 821, 832 (9th Cir.1977), cert. denied, 435 U.S. 953, 98 S.Ct. 1583, 55 L.Ed.2d 804 (1978); cf. United States v. Kramer, 711 F.2d 789, 797 (7th Cir.), cert. denied, 464 U.S. 962, 104 S.Ct. 397, 78 L.Ed.2d 339 (1983). In addition, special verdicts can be requested where necessary to determine the punishment that should be imposed. United States v. Dennis, 786 F.2d 1029, 1038-41 (11th Cir.), reh'g granted in part, 804 F.2d 1208 (1986), cert. denied, 481 U.S. 1037, 107 S.Ct. 1973, 95 L.Ed.2d 814 (1987); see also United States v. Murray, 618 F.2d 892, 895 (2d Cir.1980).
 
 
 43
 Appellants were convicted of Counts I and III, and received identical concurrent sentences. Because only one conspiracy is shown by the evidence presented at trial, we must remand for resentencing with instructions that the district court vacate and stay the judgment of conviction on one of the two counts. United States v. Andersson, 813 F.2d 1450, 1460 (9th Cir.), disapproved on other grounds, Bourjaily v. United States, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987); United States v. Palafox, 764 F.2d 558, 564 (9th Cir.1985) (en banc).
 
 C. Severance of Counts
 
 44
 Appellants contend that the district court erred in denying their motion to sever the transportation of an illegal alien, Count V, from the remaining drug related offenses. Prior to trial appellant Guillermo Sanchez-Lopez moved for a separate trial pursuant to Federal Rules of Criminal Procedure 8 and 14 regarding Count V of the indictment which charged him with transportation of an illegal alien. Appellants Epifanio Sanchez-Lopez and Astorga-Ayon joined in the motion. Epifanio Sanchez-Lopez was not named in Count V of the indictment. We will treat Epifanio Sanchez-Lopez's joinder in Guillermo Sanchez-Lopez's motion as a sloppy request for a separate trial as to Count VI of the indictment. Epifanio Sanchez-Lopez was charged in Count VI with transporting an illegal alien. Martinez-Ortega did not join in the motion. The district court denied the motions without explanation.
 
 
 45
 Misjoinder of charges under Rule 8 is a question of law which we review independently and non-deferentially. United States v. Smith, 795 F.2d 841, 850 (9th Cir.1986), cert. denied, 481 U.S. 1032, 107 S.Ct. 1964, 95 L.Ed.2d 535 (1987).
 
 
 46
 Guillermo Sanchez-Lopez moved for severance under Rule 8(a). Rule 8(a) provides:
 
 
 47
 Joinder or Offenses. Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.
 
 
 48
 Fed.R.Crim.P. 8(a). Appellants' motion under Rule 8(a) was improper because "[j]oinder of charges against multiple defendants is controlled by Rule 8(b), not by Rule 8(a)." United States v. Roselli, 432 F.2d 879, 898 (9th Cir.1970), cert. denied, 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971). When multiple defendants are involved, the types of charges which may be joined are more limited than the types of charges which may be joined against a single defendant. Id. Under Rule 8(b) joinder of charges against multiple defendants is permissible only if the defendants "are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Fed.R.Crim.P. 8(b); Roselli, 432 F.2d at 898. Therefore, we will treat Guillermo Sanchez-Lopez's Rule 8(a) motion as an inartful invocation of a Rule 8(b) motion for misjoinder. Because counsel for Epifanio Sanchez-Lopez and Astorga-Ayon merely "piggybacked" upon Guillermo Sanchez-Lopez's 8(a) motion without a supporting memorandum of law, in fairness to their clients, we will also treat their requests as Rule 8(b) motions.
 
 
 49
 We need not address appellants' claim that the offenses joined together were dissimilar in character because, unlike the charges against a single defendant, "[c]harges against multiple defendants may not be joined merely because they are similar in character[.]" Id.
 
 
 50
 Appellants also claim it was improper to join the alienage counts with the remaining counts because the counts are not "logically related" nor is there a "large area of overlapping proof." The government contends that the act of transporting the illegal aliens was part of an overall scheme or plan to smuggle drugs into the country, distribute them, and allow the illegal aliens to remain in the country with the proceeds.
 
 
 51
 The goal of Rule 8(b) is to maximize trial convenience and efficiency with a minimum of prejudice. Roselli, 432 F.2d at 899. We construe Rule 8(b) liberally in favor of initial joinder. United States v. Kenny, 645 F.2d 1323, 1344 (9th Cir.), cert. denied, 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 425 (1981).
 
 
 52
 Where considered in light of the government's theory that illegal aliens could thwart United States immigration laws if they can support themselves in this country through the money obtained through smuggling controlled substances, the controlled substances charges have a logical relationship with the transportation of illegal alien counts. It was not necessary that all the appellants participate in every act constituting each joined offense. Id. The transportation of the illegal aliens and the controlled substances from California to Idaho was part of a series of acts or transactions involving all of the appellants in some respect. The testimony regarding the trek from California to Idaho was relevant to both the transportation of illegal alien counts and the conspiracy to distribute controlled substances charges. Therefore, we conclude that initial joinder of the illegal alien counts with the remaining controlled substances related counts was proper.
 
 
 53
 Charges against multiple defendants which are properly joined under Rule 8(b) may, nevertheless, result in prejudice to a defendant because of the evidence to be presented at trial requiring severance under Rule 14. Smith, 795 F.2d at 850. We review a motion for a severance under Rule 14 due to prejudicial joinder for an abuse of discretion. Id. Rule 14 provides in pertinent part:
 
 Relief from Prejudicial Joinder
 
 54
 If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.
 
 
 55
 Fed.R.Crim.P. 14.
 
 
 56
 In order to preserve a Rule 14 motion on appeal, the motion must be renewed at the close of the evidence. Failure to renew a motion for severance under Rule 14 at the close of the evidence suggests that the alleged prejudice from joinder of the offenses did not seem so substantial to appellants in the context of the trial. United States v. Burgess, 791 F.2d 676, 678 (9th Cir.1986) (citing Williamson v. United States, 310 F.2d 192, 197 (9th Cir.1962)).
 
 
 57
 In the instant matter, none of the appellants renewed the motion to sever at the close of the government's case or at the end of the trial. Thus, the failure to renew the motion for severance at the close of the evidence resulted in a waiver of this issue. Burgess, 791 F.2d at 678; United States v. Guess, 745 F.2d 1286, 1289 (9th Cir.1984), cert. denied, 469 U.S. 1225, 105 S.Ct. 1219, 84 L.Ed.2d 360 (1985). Accordingly, we decline to review appellants' Rule 14 contention.
 
 D. Judicial Misconduct
 
 58
 Appellants contend that three comments made by the trial judge during the cross examination of appellants' only witness, Epifanio Sanchez-Lopez, "evidenced a partiality amounting to advocacy" and "usurped the jury's right to assess the credibility of witnesses." Although it is now claimed that the trial judge's comments had a prejudicial impact on the jury's verdict, none of the appellants objected to the court's comments nor made a motion for a mistrial.
 
 
 59
 Accordingly, we may only review the claim of judicial misconduct for plain error. Fed.R.Crim.P. 52(b); United States v. Kim, 577 F.2d 473, 484 (9th Cir.1978). Plain error exists only in exceptional circumstances when a substantial right of a defendant is affected. Fed.R.Crim.P. 52(b); United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 (1982).
 
 
 60
 Appellants on appeal object to the underlined comments made by the trial judge in the following transcribed portions of the trial:
 
 First Colloquy:
 Mr. Stiles:
 
 61
 Q You say Brejido (sic) worked in Earlimart?
 
 
 62
 A I think so because there is a company that he works for.
 
 
 63
 Q Did you know that he told these officers that he lived in North Hollywood, California?
 
 
 64
 MR. GORDON: Your honor, I'm going to object, that's beyond the scope and it's irrelevant. It doesn't matter what the--Brejido (sic) told the officers and it--it's not relevant and it's beyond the direct examination. We didn't inquire into where Brejido (sic) lived or what his dealings were with the officers and so he has no right to inquire into that on cross examination.
 
 
 65
 MR. STILES: Judge, on that their relationship--this strangers in the night scenario gives me the right to inquire about their prior relationship and what they knew about each other, I believe.
 
 
 66
 MR. GORDON: I don't think that was prior relationship. Prior relationship isn't what he told Officer Robinson--or Agent Robinson after his arrest in November.
 
 
 67
 THE COURT: I think he is calling his attention to the other evidence and let him explain if he can why his is different.
 
 
 68
 MR. GORDON: Well wouldn't he have to then, Your Honor, lay foundation as to whether or not he even knows or was present when Brejido (sic) made his statement to Officer Robinson. He is asking the question as if it is assumed that Epifanio--excuse me that Epifanio was present when Brejido made this. At the very least we need foundation.
 
 
 69
 THE COURT: Well I think he is just giving him the information that there's other testimony and asking him if that affects his testimony. He may do so.
 
 
 70
 (emphasis added).
 
 Second colloquy:
 By Mr. Stiles:
 
 71
 Q Are there many places to stop and get gas?
 
 
 72
 A Yes, there is.
 
 
 73
 Q And where did find [you] Guillermo there?
 
 
 74
 MR. GORDON: I'm going to object to that, Your Honor, that distorts the testimony. The testimony was very clearly that the cars met on Highway 99.
 
 
 75
 THE COURT: Well he has a right to cross examine on that and/
 
 
 76
 MR. GORDON: But the questions (sic) puts into evidence the distortion. He testified on highway 99 and proceeded to Sacramento together. Not that they met there, meaning Sacramento.
 
 
 77
 THE COURT: Well he has a right to cross examination without you're (sic) coaching the witness, so.
 
 
 78
 (emphasis added).
 
 Third colloquy:
 By Mr. Stiles:
 
 79
 Q Did you have to travel from the time you got the flat tire fixed to Twin Falls at very slow speeds?
 
 
 80
 MR. GORDON: Your Honor, I'm going to object, the witness has testified, I think, three times now that both of the flat tires occurred in Guillermo's car. And I think the questions continue to be misleading in the attempted--counsel is always asking about his flat tires and his car. I think the testimony is very clear, that it was Guillermo who got a flat tire and he put his little tire on it. They rode together slowly towards Twin Falls, he continued on and Guillermo went into Twin Falls to get the tires changed. And I would ask the Court to instruct him to keep those fact straight if he is going to continue to question him on this.
 
 
 81
 THE COURT: He has a right to challenge those facts by his interrogation.
 
 
 82
 MR. GORDON: It sure seems to me, Your Honor, there/
 
 
 83
 THE COURT: He has a right to see if he'll tell the story the same way twice.
 
 
 84
 (emphasis added).
 
 
 85
 A trial judge must avoid the appearance of advocacy or partiality. United States v. Eldred, 588 F.2d 746, 749 (9th Cir.1978). However, a judge is not "expected to sit mute and impassive, speaking only to rule on motions or objections." Id.
 
 
 86
 The trial judge's comments were addressed to defense counsel in response to his objections to cross-examination. It is unlikely that the comments affected appellants' "substantial rights" or affected the outcome of the trial. See id. at 750 ("comments by the judge to defense counsel were neither calculated to disparge [the defendant] in the eyes of the jury, nor likely to affect the outcome of the trial.") (citation omitted).
 
 
 87
 Moreover, in the unlikely event the trial judge's remarks may have been interpreted by the jury as a comment on Epifanio Sanchez-Lopez's credibility, any possible adverse impact was obviated by the following instruction given by the court: "The law of the United States permits the judge to comment to the jury on the evidence in the case. Such comments are only expressions of the judge's opinion of the facts and the jury may disregard them entirely since the jurors are the sole judges of the facts." See Quercia v. United States, 289 U.S. 466, 469, 53 S.Ct. 698, 699, 77 L.Ed. 1321 (1933) (a judge may comment upon the evidence and may express an opinion on the facts as long as the judge makes it clear to the jury that all matters of fact are submitted for their determination); see also United States v. Poland, 659 F.2d 884, 894 (9th Cir.), cert. denied, 454 U.S. 1059, 102 S.Ct. 611, 70 L.Ed.2d 598 (1981). Appellants have failed to demonstrate that the judge's comments constituted plain error.
 
 E. Hearsay Objection
 
 88
 Appellant Brijido Astorga-Ayon contends that the district court committed prejudicial error in allowing a government witness to testify to an extrajudicial statement regarding Brijido made in a telephone conversation. We review a district court's decision to admit evidence for abuse of discretion. United States v. Marchini, 797 F.2d 759, 762 (9th Cir.1986), cert. denied, 479 U.S. 1085, 107 S.Ct. 1288, 94 L.Ed.2d 145 (1987).
 
 
 89
 Brijido Astorga-Ayon contends that the following underlined testimony was inadmissible hearsay:
 
 BY MR. STILES:
 
 90
 Q Did you--do you know Brejido (sic)?
 
 
 91
 A No.
 
 
 92
 Q During your conversations with Antonio and others in California, did anyone every mention Brejido's (sic) name?
 
 
 93
 MR. GORDON: Your Honor, I'm going to object to that question depending on--and I suppose I really need to ask some questions in aid of objection, but if the answer is that Antonio mentioned him it would [be] unobjectionable. If the answer is that someone else, unnamed, were to have mentioned Brejido (sic) that would be objectionable hearsay.
 
 
 94
 THE COURT: Well, he's not going to say anything but yes or not to this one.
 
 
 95
 MR. STILES: Thank you.
 
 BY MR. STILES:
 
 96
 Q In the course of your tele phone conversations, did anyone ever mention Brejido's (sic) name?
 
 
 97
 THE COURT: We want a yes or no answer.
 
 
 98
 THE INTERPRETER: Yes.
 
 BY MR. STILES:
 
 99
 Q And was that one of the times that you called to Antonio's house?
 
 
 100
 A Yes. He wasn't there because he was at Brejido's (sic) house.
 
 
 101
 MR. GORDON: Your Honor, I'm going to object. That's--and ask that that answer be stricken. It was nonresponsive, it went beyond the kind of cautionary instructions that the Court has given and it was an attempt to get in something for truth of it without knowing who allegedly even made the remarks.
 
 
 102
 MR. STILES: Your Honor? It's clearly not offered for the truth of it. It's--the only reason it's offered is that the statement was made.
 
 
 103
 THE COURT: I'll admit it. Sometimes we let evidence in not to prove the truth of what's said, but merely to establish what was said. And this is one of those things that what he said may be admissible because that was what he was told, just what he was told. But whether that answer is true or not, whether that's where he was or not, is not established by the answer and is not admitted for that purpose. Do you understand?
 
 
 104
 MR. GORDON: Your Honor, I don't even know who allegedly made the statement, whether it was an adult or a child/
 
 
 105
 THE COURT: Well, I don't know that he knows either. But you can end on the cross examination.
 
 BY MR. STILES:
 
 106
 Q Do you know who told you that, Mr. Ramon?
 
 
 107
 A Sister-in-law of him.
 
 
 108
 Q Sister-in-law of Antonio or Brejido (sic)?
 
 
 109
 A Filimon's wife.
 
 
 110
 Q Oh.
 
 
 111
 MR. GORDON: Your Honor, I want to renew my objection. Filimon's wife is not here today, she isn't subject to cross examination and it seems to me that this is being offered for the truth of it. And without the declarant being available to be cross examined, without any showing of what Brejido (sic) even/
 
 
 112
 THE COURT: I've already instructed the jury on it and I think they'll follow the instructions. Your objection is overruled.
 
 
 113
 (emphasis added). Brijido Astorga-Ayon also contends that if the statement was not submitted for its truth it was irrelevant and inadmissible.
 
 
 114
 Federal Rule of Evidence 801 defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing offered in evidence to prove the truth of the matter asserted." Because the witness' statement was not offered to prove that Antonio Martinez-Ortega was at Brijido's house, it was not hearsay. However, it was only admissible if it was relevant. See United States v. Candoli, 870 F.2d 496, 508 (9th Cir.1989) (statement which was not admitted for the truth of the matter asserted was not hearsay, but was admissible only if it was relevant).
 
 
 115
 Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. The government did not demonstrate to the district court that the challenged hearsay statement was relevant to the proof of any fact at issue in the trial. Instead, the court was told that "the only reason it's offered is that the statement was made."
 
 
 116
 A hearsay declaration may be admissible if it is offered, not for the truth of the matter asserted, but to prove that the persons involved in the communication were coconspirators. See United States v. Mazyak, 650 F.2d 788, 792 (5th Cir.1981) (letter addressed to individuals charged with a conspiracy which was found on a vessel containing contraband was not admitted for its truth, but was relevant evidence admitted for the limited purpose of linking the individuals to the vessel and to each other), cert. denied, 455 U.S. 922, 102 S.Ct. 1281, 71 L.Ed.2d 464 (1982); United States v. Lopez, 584 F.2d 1175, 1179 (2d Cir.1978) (taped conversation between two persons was not admitted for its truth, but was relevant evidence to show that the two individuals knew each other). The cited cases are not applicable to the matter before this court, however, because in each case the individuals who were to be "connected" to each other were parties to the communication. In the instant matter, the communication was between the D.E.A. agent and Filimon's wife. A connection between the D.E.A. agent and Filimon's wife was not relevant to any issue at trial.
 
 
 117
 The statement made by Filimon's wife had negligible probative value for the proof of any fact at issue at trial, unless it was offered for the truth of the matter asserted. No showing was made that the declarant had personal knowledge of Antonio's relationship with Brijido. Moreover, the jury had no way of determining if the declaration or any inference that could be drawn therefrom was competent evidence. The district court did not instruct the jury that the statement was offered for the limited purpose of showing that Antonio knew Brijido.
 
 
 118
 Because the government failed to lay a foundation that the hearsay statement had any probative value apart from the improper purpose of establishing the truth of the matter asserted, the district court abused its discretion in admitting it "to establish what was said." Cf. United States v. Anello, 765 F.2d 253, 261 (1st Cir.) (although jury may have accepted the evidence for its truth, "given the relevant non-hearsay use, and the fact that the defendant could have obtained a limiting instruction" the district court did not err in admitting the evidence), cert. denied, 474 U.S. 996, 106 S.Ct. 411, 88 L.Ed.2d 361 (1985).
 
 
 119
 Error in the admission of the hearsay evidence, however, does not compel reversal. Under Rule 52(a) of the Federal Rules of Criminal Procedure, "[a]ny error, defect, irregularity or variance which does not affect substantial rights should be disregarded." As summarized above, the government introduced admissible evidence connecting Brijido to his coconspirators. Fingerprints attributed by expert testimony to Brijido Astorga-Ayon, Epifanio Sanchez-Lopez, and Guillermo Sanchez-Lopez, were found on packages containing cocaine and heroin. Accordingly, admission of the statement that Brijido was at Antonio's house was harmless error. Fed.R.Crim.P. 52(a); see United States v. Cowley, 720 F.2d 1037, 1045 (9th Cir.1983) (error in admitting evidence harmless where other evidence sufficiently supports jury's conclusion), cert. denied, 465 U.S. 1029, 104 S.Ct. 1290, 79 L.Ed.2d 692 (1984).
 
 F. Relevancy Objections
 
 120
 Appellants contend that the district court admitted irrelevant and highly prejudicial testimony regarding the price of heroin; the purity of the confiscated heroin and cocaine; the presence of a false compartment behind the glove compartment of one of the appellants' cars; and the odor of perfume emanating from one of the cars at the time appellants' were arrested. We review a district court's decision regarding the relevancy and admissibility of evidence for abuse of discretion. United States v. Feldman, 788 F.2d 544, 557 (9th Cir.1986), cert. denied, 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987).
 
 
 121
 Appellants were charged with a conspiracy to distribute cocaine and heroin and with possession with intent to distribute heroin and cocaine. Therefore, the price, quantity and quality of the cocaine and heroin was highly relevant to establish the appellants' knowledge of the presence of the contraband in the car and intent to distribute the contraband. United States v. Costa, 691 F.2d 1358, 1361-62 (11th Cir.1982); United States v. Sheikh, 654 F.2d 1057, 1067 (5th Cir.1981), cert. denied, 455 U.S. 991, 102 S.Ct. 1617, 71 L.Ed.2d 852 (1982); United States v. Kearney, 560 F.2d 1358, 1369 (9th Cir.), cert. denied, 434 U.S. 971, 98 S.Ct. 522, 54 L.Ed.2d 460 (1977).
 
 
 122
 Officer Pieper testified that when he stopped the appellants' car he discovered the contraband in the backseat and observed the strong odor of perfume. He also testified that black tar heroin has an odor and that from his experience perfume was used to mask the presence of contraband. This evidence was highly relevant to establish knowledge of the existence of the contraband. This circumstantial evidence was also relevant to substantiate the conspiracy charge. See United States v. Humphrey, 759 F.2d 743, 751 (9th Cir.1985) (where cabin containing large quantity of marijuana reeked with the odor of marijuana, it was "reasonable to infer that the occupants were engaged in more than mere knowing presence" supporting "inference that crew members possessed contraband with intent to distribute it and participated in a conspiracy to do so."), cert. denied, 480 U.S. 917, 107 S.Ct. 1371, 94 L.Ed.2d 686 (1987).
 
 
 123
 A state narcotics officer testified that he discovered a "cut out" behind the glove compartment of Guillermo Sanchez-Lopez's car. He also testified that narcotics traffickers often use false compartments to smuggle drugs. Although no drugs were found in the compartment hidden behind the glove compartment in Guillermo Sanchez-Lopez's car, the officer testified that a kilogram of cocaine, packaged similarly to the ones in Epifanio Sanchez-Lopez's car, could be concealed within the compartment. This circumstantial evidence was relevant to establish a connection with the illegal drugs and to infer that appellants were part of the conspiracy. See United States v. U.S. Currency, $83,310.78, 851 F.2d 1231, 1236 (9th Cir.1988) (attempt to hide money was relevant fact in considering whether there was a connection with the illegal drug transaction).
 
 
 124
 The district court did not abuse its wide discretion by admitting the relevant contested evidence.
 
 G. Sentencing Guidelines
 
 125
 The district court held that the Sentencing Guidelines were unconstitutional partially based on a finding that they violated due process. The district court stayed the effect of this ruling pending a ruling on the constitutionality of the Sentencing Guidelines by the Supreme Court. The Supreme Court upheld the constitutionality of the Sentencing Guidelines in Mistretta v. United States, --- U.S. ----, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). The Supreme Court, however, did not address a due process challenge to the Sentencing Guidelines. Appellants at oral argument questioned whether the district court's ruling with regard to the due process challenge to the Sentencing Guidelines survived Mistretta. Appellants did not brief the issue on appeal nor did they file a request to submit supplemental briefs after the Supreme Court's decision in Mistretta. Appellants' contentions on appeal challenge only certain sections of the Sentencing Guidelines as applied to them. Under these circumstances, we conclude that appellants' due process challenge to the Sentencing Guidelines was not properly raised on appeal. On remand, appellants are free to present this challenge to the district court. We will address below only those arguments regarding sentencing presented in appellants' briefs.
 
 
 126
 1. Failure to Grant Point Reductions in Applying the Sentencing Guidelines
 
 
 127
 Appellants Astorga-Ayon, Epifanio Sanchez-Lopez, and Guillermo Sanchez-Lopez contend that the district court erred in failing to grant them point reductions under Section 3B1.2 of the Sentencing Guidelines for their minimal or minor participation in the criminal activity. The district court rejected appellants' claim that their participation in the crime was minimal.
 
 
 128
 Section 3B1.2 of the Sentencing Guidelines provides:
 
 Mitigating Role
 
 129
 Based on the defendant's role in the offense, decrease the offense level as follows:
 
 
 130
 (a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.
 
 
 131
 (b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels.
 
 
 132
 In cases falling between (a) and (b), decrease by 3 levels.
 
 The commentary to Section 3B1.2 provides:
 Application Notes:
 
 133
 1. Subsection (a) applies to a defendant who plays a minimal role in concerted activity. It is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group. Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant.
 
 
 134
 2. It is intended that the downward adjustment for a minimal participant will be used infrequently. It would be appropriate, for example, for someone who played no other role in a very large drug smuggling operation than to offload part of a single marihuana shipment, or in a case where an individual was recruited as a courier for a single smuggling transaction involving a small amount of drugs.
 
 
 135
 3. For purposes of Sec. 3B1.2(b), a minor participant means any participant who is less culpable than most other participants, but whose role could not be described as minimal.
 
 
 136
 Background: This section provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant. The determination whether to apply subsection (a) or subsection (b), or an intermediate adjustment, involves a determination that is heavily dependent upon the facts of the particular case.
 
 
 137
 In reviewing a sentence under the Sentencing Guidelines, we must determine whether the sentence "(1) was imposed in violation of law; (2) was imposed as a result of an incorrect application of the sentencing guidelines; (3) is outside the application guideline range, and is unreasonable ... or (4) was imposed for an offense for which there is no applicable sentencing guideline and is plainly unreasonable." 18 U.S.C. Sec. 3742(e) (1989 Supp). We must "give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous and shall give due deference to the district court's application of the guidelines to the facts." 18 U.S.C. Sec. 3742(e).
 
 
 138
 Whether a defendant is a "minor" or "minimal" participant in the criminal activity is a factual determination subject to the clearly erroneous standard. United States v. Franco-Torres, 869 F.2d 797, 800 (5th Cir.1989). Such a factual determination turns upon culpability which requires consideration of a variety of factors. Minor or "[m]inimal participant status is not a legal conclusion derived by applying the guidelines to factual determinations." Id.
 
 
 139
 Epifanio Sanchez-Lopez, Astorga-Ayon, and Guillermo Sanchez-Lopez claim they were minor or minimal participants and invite us to read the record and determine whether the district court erred "in concluding that the participation of the [appellants] was not minimal."
 
 
 140
 In determining that Epifanio Sanchez-Lopez and Astorga-Ayon were not minimal or minor participants the district court stated in its order that the appellants' involvement "was more than minimal" and adopted the reasoning in the probation officer's recommendation. With regard to Epifanio Sanchez-Lopez, the addendum to the presentence report recommended against a finding of minimal or minor participant status because he was the driver of the car in which all the narcotics were found; his fingerprints were on the plastic bags containing the narcotics, and a significant quantity of heroin (574.06 grams of heroin or equivalent) was confiscated. With regard to Astorga-Ayon the addendum to the presentence report recommended against a finding of minimal or minor participant status because Astorga-Ayon was apprehended with the other three defendants when the narcotics were confiscated, his fingerprints were on the narcotics packages, and a significant amount of heroin (574.06 grams of heroin or equivalent) was involved.
 
 
 141
 Guillermo Sanchez-Lopez did not object to the presentence report. Guillermo Sanchez-Lopez raised his claim of minor or minimal participant status for the first time at the sentencing hearing. The district court concluded that Guillermo Sanchez-Lopez's participation in the criminal activity was equal to that of the other appellants.
 
 
 142
 Appellants do not challenge the district court's findings and the record supports them. The district court did not err in determining that Epifanio Sanchez-Lopez, Astorga-Ayon, and Guillermo Sanchez-Lopez were not minor nor minimal participants.
 
 
 143
 Our conclusion is supported by the decisions of the Fifth Circuit. The Fifth Circuit "encourage[s] judges to supply more specific factual findings, [however,] a simple statement that the defendant was not a 'minor participant' will suffice as a factual finding." United States v. Gallegos, 868 F.2d 711, 713 (5th Cir.1989). In the instant matter, the district court's findings were specific. The factors considered by the district court are comparable to those found appropriate by the Fifth Circuit. See United States v. Thomas, 870 F.2d 174, 177 (5th Cir.1989) (defendant was not a minor or minimal participant where the crime involved a significant quantity of a dangerous drugs); United States v. Rojas, 868 F.2d 1409, 1410 (5th Cir.1989) (defendant was not a minor or minimal participant where defendant possessed 497 grams of cocaine, a significant quantity); Gallegos, 868 F.2d at 713 (defendant was not a minor or minimal participant where he was apprehended with a significant quantity of heroin); United States v. Velasquez, 868 F.2d 714, 715 (5th Cir.1989) (defendant was not a minor or minimal participant where district court repeatedly commented on the gravity of the offense and defendant was apprehended with almost three tons of marijuana); United States v. Buenrostro, 868 F.2d 135, 138 (5th Cir.1989) (defendant was not a minor nor minimal participant where defendant was carrying a large quantity of drugs and defendant's intent to get the drugs past that last road block into the United States was a critical event in narcotics trafficking).
 
 2. Career Offender Provision
 
 144
 a. Double Enhancement of Punishment
 
 
 145
 Appellant Antonio Martinez-Ortega contends that the application of the career offender provision of the Sentencing Guidelines, Section 4B1.1, resulted in a double enhancement of his punishment. The district court rejected Martinez-Ortega's argument concluding that "the double enhancement if it exists was intended by the Congress and the Sentencing Commission." This double enhancement issue is a mixed question of fact and law which we review independently and non-deferentially. United States v. McConney, 728 F.2d 1195, 1200 (9th Cir.) (en banc), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).
 
 
 146
 Section 4B1.1 of the Sentencing Guidelines provides:
 
 Career Offender
 
 147
 A defendant is a career offender if (1) the defendant was at least eighteen years old at the time of the instant offense, (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense, and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense. If the offense level for a career criminal from the table below is greater than the offense level otherwise applicable, the offense level from the table below shall apply. A career offender's criminal history category in every case shall be Category VI.
 
 
 148
 Offense Statutory Maximum Offense Level
 (A) Life 37
 (B) 25 years or more 34
 (C) 20 years or more, but less than 25 years 32
 (D) 15 years or more, but less than 20 years 29
 (E) 10 years or more, but less than 15 years 24
 (F) 5 years or more, but less than 10 years 17
 (G) More than 1 year, but less than 5 years 12
 
 
 149
 Under 21 U.S.C. Sec. 841(b)(1)(B), because Martinez-Ortega has two prior state drug offense convictions, the applicable sentence is a mandatory minimum of 10 years to a maximum sentence of life for his conviction of possession with intent to distribute 100 grams of heroin and 500 grams of cocaine. Because the maximum sentence under the statute is life, under the career offender provision of the Sentencing Guidelines Martinez-Ortega was given an offense level of 37 and a criminal history of VI. The resulting sentence under the guidelines was 30 years to life. Sentencing Guidelines, Sentencing Table. Martinez-Ortega was given a sentence of 30 years.
 
 
 150
 Martinez-Ortega contends that because his two prior convictions enhanced the permissible punishment under section 841(b)(1)(B) from a range of 5 years to 40 years to a range of 10 years to life, and because the maximum punishment of life results in a higher offense level under the Sentencing Guidelines, impermissible double enhancement occurs.
 
 
 151
 Multiple penalties for a single criminal transaction are not necessarily impermissible where Congress manifests its intent that enhancement of penalties is proper. United States v. Blocker, 802 F.2d 1102, 1105 (9th Cir.1986). In the instant matter, however, it does not appear that there was any double enhancement of penalties. The Sentencing Guidelines are not a separate statutory provision of penalties. The Sentencing Guidelines are intended to provide a narrow sentence range within the range authorized by the statute for the offense of conviction. See 28 U.S.C. Sec. 994(b)(2) (1988 Supp.) (specifying the sentence range under the Sentencing Guidelines); Mistretta, 109 S.Ct. at 656; Commentary, Application Note # 10 to Sentencing Guidelines Sec. 2D1.1 ("The Commission has used the sentences provided in ... the statute (21 U.S.C. Sec. 841(b)(1), as the primary basis for the guideline sentences."). Indeed, the Commentary to Sec. 5G1.1 of the Sentencing Guidelines provides, "If the statute requires imposition of a sentence other than that required by the guidelines, the statute shall control. The sentence imposed should be consistent with the statute but as close as possible to the guidelines." Thus, the range of 30 years to life calculated under the Sentencing Guidelines as applied to Martinez-Ortega was within the statutory range of 10 years to life under section 841(b)(1)(B). The method the Sentencing Commission used to calculate the sentence under the career offender provision is of no consequence in the instant matter where the sentence is sanctioned by Congress by statute.
 
 
 152
 Moreover, Congress made it very clear that the Sentencing Commission should ensure that individuals who were convicted of a controlled substance offense, who were over eighteen years of age, and who had two or more prior felonies for controlled substance offenses, should receive a sentence of imprisonment under the guidelines that is at or near the maximum term authorized by statute. 28 U.S.C. Sec. 994(h); accord Commentary to Sentencing Guidelines Sec. 4B1.1. The career offender provision, section 4B1.1, implements Congress' mandate. Mistretta, 109 S.Ct. at 657.
 
 
 153
 Indeed, if the district court had not applied the career offender provision, Congress' intent for repeated drug offenders to have near the maximum sentence would have been thwarted. Without application of the career offender provision Martinez-Ortega had an offense level of 26 and a criminal history of III. The applicable range of 6 years and 6 months to 8 years and 1 month does not even encompass the statutory mandatory minimum of 10 years which would have had to be imposed. 21 U.S.C. 841(b)(1)(B); Sentencing Guidelines Sec. 5G1.1.
 
 
 154
 The cases relied on by Martinez-Ortega are readily distinguishable. In Simpson v. United States, 435 U.S. 6, 98 S.Ct. 909, 55 L.Ed.2d 70 (1978), the defendants were convicted of bank robbery and using a firearm in the commission of a felony. Id. at 8, 98 S.Ct. at 910-11. The bank robbery statute enhanced the sentence from a possible 20 years to 25 years, if the robbery was committed with the use of a dangerous weapon or device. Id. at 7, 98 S.Ct. at 910. The Court concluded that the imposition of a enhanced penalty under the bank robbery statute and the imposition of an additional consecutive penalty under the separate firearm statute was impermissible because Congress did not intend such a result. Id. at 12-15, 98 S.Ct. at 913-14. Thus, by convicting the defendants of both statutes the defendants were being punished twice for use of a firearm and were subject to a total sentence beyond the maximum permitted for use of a firearm during a robbery under the robbery statute. See also Busic v. United States, 446 U.S. 398, 403-11, 100 S.Ct. 1747, 1751-55, 64 L.Ed.2d 381 (1980) (impermissible to convict defendant of assault with a deadly weapon and use of a firearm during a federal felony where assault statute enhances the punishment for assault with a deadly weapon).[1]
 
 
 155
 Unlike the situations in Simpson and Busic, Martinez-Ortega has not been convicted under two statutes for one criminal activity. The use of the criminal offender statute produced a sentence within the range authorized by statute for one criminal activity. The district court did not err in applying the career offender provision.
 
 
 156
 b. Unlawful Sub-Delegation of Congressional Authority to the
 
 States
 
 157
 Martinez-Ortega contends that the career offender provision of the Sentencing Guidelines involves an unconstitutional sub-delegation of congressional authority to the various states because the career offender provision is triggered by not only previous federal drug convictions, but also state drug convictions, which effectively allows the various states to define a felonious drug offense for purposes of federal law. The district court did not decide this precise issue because it found that the Sentencing Guidelines as a whole were unconstitutional.
 
 
 158
 The Supreme Court in Mistretta rejected the argument that the delegation of power to the Sentencing Commission to promulgate sentencing guidelines was an unconstitutional delegation of power and excessive legislative discretion. 109 S.Ct. at 654. The Court explained:
 
 
 159
 "In determining what [Congress] may do in seeking assistance from another branch, the extent and character of that assistance must be fixed according to common sense and the inherent necessities of the government co-ordination." J.W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 406, 48 S.Ct. 348, 351, 72 L.Ed. 624 (1928). So long as Congress "shall lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power." Id., at 409, 48 S.Ct., at 352.
 
 
 160
 Id.
 
 
 161
 Similarly, in the specific context of the career offender provision, Congress specifically delineated the types of individuals and conduct which should be a part of the career offender provision. 28 U.S.C. Sec. 994(h). Moreover, with respect to prior controlled substance offenses, the commentary to section 4B1.2 of the Sentencing Guidelines is explicit and specific. Application note number 2 to section 4B1.2 provides:
 
 
 162
 "Controlled substance offense" includes any federal or state offense that is substantially similar to any of those listed in subsection (2) of the guideline. These offenses include manufacturing, importing, distributing dispensing, or possessing with intent to manufacture, import, distribute, or dispense, a controlled substance (or a counterfeit substance). This definition also includes aiding and abetting, conspiring, or attempting to commit such offenses, and other offenses that are substantially equivalent to the offenses listed.
 
 
 163
 Subsection (2) of section 3B1.2 provides: "The term 'controlled substance offense' as used in this provision means an offense identified in 21 U.S.C. Secs. 841, 845b, 856, 952(a), 955, 955a, 959; and similar offenses." Indeed, Congress amended 21 U.S.C. Sec. 841 in 1984 to permit the enhancement of maximum penalties for controlled substance offenses to include a prior state felony drug conviction within the definition of a prior felony conviction. S.Rep. No. 225, 98th Cong., 2d Sess., reprinted in 1984 U.S.Code Cong. & Admin.News 3182, 3440-41. "Thus, the career offender provision is well within the 'intelligible principle' requirement for permissible delegation of legislative power." United States v. Belgard, 694 F.Supp. 1488, 1499 (D.Or.1988).
 
 
 164
 c. Use of Convictions Prior to November 1, 1987
 
 
 165
 Martinez-Ortega contends that application of the career offender provision was improper because the Sentencing Guidelines only apply to conduct occurring after November 1, 1987, and his prior convictions in 1985 and 1986 occurred prior to the effective date of the Sentencing Guidelines. This particular argument was not presented to the district court. In any event, Congress did not intend for all criminals to start with a clean slate on November 1, 1987. On the contrary, Congress specifically mandated that the Sentencing Commission use prior convictions in determining career offender status of defendants and in otherwise determining a defendant's criminal history for sentencing purposes. 28 U.S.C. Sec. 994(h) and (i).
 
 III
 CONCLUSION
 
 166
 We remand the case to the district court with instructions that the district court vacate and stay the judgment of conviction on Count I or Count III and resentence, if necessary. The stay is to become permanent upon the completion of the sentence on the remaining count. The judgment of conviction on all other counts is affirmed.
 
 
 
 *
 Honorable A. Wallace Tashima, United States District Judge for the Central District of California, sitting by designation
 
 
 [1]
 Congress subsequently amended 18 U.S.C. Sec. 924(c), which proscribes use of a firearm or carrying a firearm during a felony, "with the express purpose of authorizing an additional sentence to that imposed for the underlying felony." United States v. Gonzalez, 800 F.2d 895, 898 (9th Cir.1986)